FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2022 AUG -8 PM 3: 36

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

# IN THE UNITED STATES COURT

# FOR THE DISTRICT OF COLORADO

Civil Action No.:

Caroll Latimore, Plaintiff,                                    JURY DEMANDED

v.

All defendants as individuals and as employees:
Denver Housing Authority (DHA) of the City and County of Denver;
David Nisivoccia, Executive Director, DHA;
Loretta Owens, Director Housing Voucher Program, DHA;
Nicole Matteo, employee DHA;
Angie Trujillo, employee DHA;
Mercedes Pineda, 504 Coordinator, DHA.

---

# COMPLAINT

---

Caroll Latimore, Pro Se
Mailing address:
1541 N. Marion St.
Box 18628
Denver, Colorado  80218
(239) 537-5966

Gerritt Koser, Esq.
Senior Staff Attorney
Denver Housing Authority
(for all defendants unless told otherwise)
1035 Osage St.
Denver, Colorado  80204
(720) 932-3092

## THE PARTIES

1.      **Plaintiff is Caroll Latimore**, participant in the Housing Voucher Choice Program (Sec 8) since 2007. Moved to Denver October 2020.  Plaintiff notified DHA in Dec 2020 she receives all of her mail at the post office.


**Defendants are:**

2.      **Denver Housing Authority of the City and County of Denver**, believed to be a non-profit, corporate, quasi-municipal organization, is a defendant due to policies that violate disability laws and the Constitution. Two of three of these are in writing. The first is they will not send mail to a po box. This rule is by reference in a contract participants are required to sign to obtain housing in Denver and they have gone to court over it once and if they do now, it will be the second time. The other two are the policy of ceasing all communications due to Plaintiff not getting mail at her residence, and third, for using a package of papers to ask for accommodations that violate disability law and the Constitution and used these to disapprove someone for accommodations who has a serious mental illness.

3.      **David Nisivoccia**, Executive Director of Denver Housing Authority, negligence for presiding over an organization with no understanding of disability laws or Constitutional rights.

4.     **Loretta Owens**, Director, Housing Voucher Choice Program, DHA. Plaintiff spoke to her once. Has followed a policy not to communicate with Plaintiff in any manner since last fall 2021 in violation of the Americans with Disabilities Act of 1990 (ADA), its amendments of 2008 (ADAA)and the United States Constitution presumably for the reason of Plaintiff not getting mail at her residence but since two other offices at DHA have also cut communications, it appears to be an organizational policy. Ms. Owens should know the policy violates disability laws and the Constitution and should be following morals and the law in spite of an illegal local policy.

5.     **Mercedes Pineda**, 504 Coordinator DHA.  Denied Plaintiff accommodations in violation of the ADA. Committed moral violation of indicating she had sent a letter to Plaintiff when she had not.

6.     **Nicole Mateo**, DHA employee, Plaintiff has had no communication with, but she was instructed to email required information to Plaintiff on July 14, 2021; she didn't email it. She canceled Plaintiff's housing voucher on Sept 1, 2021 for not returning the forms she had not sent.  Appears to have committed a Constitutional conspiracy with Ms. Trujillo. If she had followed her instructions to email Plaintiff the needed information, there would not have been a lawsuit last Sept.

7.     **Angie Trujillo**, DHA employee, had been Plaintiff's contact from August 2020 (in organizing the move from Michigan to Denver) until fall 2021. With full knowledge, concealed Plaintiff's follow-up letter regarding accommodations dated May 2, 2021 from other staff after having told Plaintiff on January 15, 2021 she was going to discuss the matter with her supervisor based on Plaintiff's phone discussion with her. (Plaintiff found

copy of memorandum of the call contents made that day.) Then proceeded over the summer of 2021 sending information to Plaintiff where she had been told verbally and in writing that Plaintiff does not receive mail and anything sent there would be returned. Appears to have decided to get rid of Plaintiff from the program because Plaintiff told her per the law she was entitled to accommodations. She told her over the phone in January 2021 and in the letter of May 2, 2021. Ms. Matteo decided to help her to achieve her goal either on her own accord or at the request of Ms. Trujillo. If Ms. Trujillo had not been unethical in mailing to an address where she knew Plaintiff didn't receive mail, didn't admit mail had been returned, and played innocent to Ms. Owens as if she had made honest efforts, the lawsuit last Sept would not have occurred.

## GENERAL DESCRIPTION OF PRIOR EVENTS

8.     The parties are the same as in the case of Sept 2021, *Latimore v. Nisivoccia et al.* 1-21-cv-02431-GPG except DHA as an organization has been added due to their policies and Ms. Pineda has been added due to her unwillingness to follow disability law and for falsely asserting having sent Plaintiff a letter she had not sent. She also failed to send emails of three communications as agreed in the stipulation.

9.     Plaintiff is filing again in spite of signing a stipulation with prejudice due to Defendants breaking the stipulation four times and because Plaintiff signed the stipulation under duress with no fair and full opportunity to consider what had happened

due to being in shock over having had her housing voucher canceled without pre or post process and believes the position of defendants demanding to dictate where Plaintiff receives mail is unconstitutional.

10.    Plaintiff believes that probably all the matters in this complaint relate to things that occurred after the Stipulation was signed Sept 16, 2021. Even the issue of the conspiracy Plaintiff could not have been aware of until Oct 6, 2021. Defendants' attorney sent Plaintiff a copy of the email where Ms. Matteo had been instructed by email to email Plaintiff the information she needed last year to timely apply for renewal of her housing for FY2022. Due to him sending Plaintiff the email when she was completely preoccupied with being told different amounts of rent due by her landlord and the housing office and her mind was still mush from the shocking event of finding out after the fact that her voucher had been canceled, Plaintiff didn't notice the critical nature of what was in the email until June 2022 when filing papers.

## I.      JURISDICTION

11.   28 U.S.C. §1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

12.    28 U.S.C. §1343. Civil rights and elective franchise

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

## II. VENUE

13.    §1391. Venue generally

The Defendants work in Denver, the Plaintiff lives in Denver, and the acts complained of were in Denver.

## III.    INTRODUCTION AND FACT SUMMARY

14.    Plaintiff was determined by the Social Security Administration to have been disabled since 2005. This is of the nature of functional brain issues. It includes depression, anxiety, a mood disorder, ADD, OCD and some other complexities that constitute what is regarded as serious mental illness. Basically the entire issue in this case is that Plaintiff is unable to receive mail at her apartment due to her disability, the

6

reasoning of which has been explained extensively to Defendants. Plaintiff received a Sec 8 Housing Voucher in 2007.  In 2021, At least two DHA employees conspired to and did terminate Plaintiff's housing voucher without notice pre or post termination. Plaintiff filed suit in this Court last September to get the voucher reinstated. This is the second year DHA is not sharing program information with Plaintiff and Defendants are likely planning to cancel Plaintiff's housing voucher again this year because they have refused to communicate with Plaintiff and have not sent her necessary forms to be able to have housing come Oct. 1, 2022.

15.     The same thing is happening this year, in terms of not providing renewal information to Plaintiff but this time it's happening under the purview of the Director of the Housing Voucher Program, Ms. Owens. DHA has terminated ALL communication with Plaintiff since anytime after the September 2021 suit, because Plaintiff gets her mail at the post office rather than at her apartment building. Plaintiff got back into the Voucher Program in 2021 by signing a stipulation with the DHA, which they have violated.  She signed under duress being three weeks from being homeless and had no time to evaluate what had even happened, let alone claims or remedies. She was essentially in shock.

16.     After that suit was done, Plaintiff provided DHA with a statement from her doctor of the types of impacts her disability can have. **(Attach 1**, Plaintiff's doctors statement with cover letter.) Her doctor could hardly put together an extensive write-up of two decades of treatment. Her doctor is not required to provide extensive justification for such an accommodation. Plaintiff is surprised this agency can't look at this statement

and immediately see that Plaintiff needs help with many things. The things Plaintiff has

trouble with SHE MUST TELL HER DOCTOR, HER DOCTOR DOESN'T TELL HER.  In

their last conversation, Plaintiff discussed with her doctor how she needs to write to

think and organize her thoughts.  That was something her doctor didn't know. She can't

possibly tell her doctor everything.  Like standing on a street that goes east and west

and being confused because the bus sign posted says north or south.  Then she

realized the sign meant the overall direction of the bus, not the direction from that

particular stop.

17.     The following is from a joint statement of the Department of Housing and Urban

Development and the Department of Justice, May 17, 2004, Reasonable

Accommodations under the Fair Housing Act, pg 6, example 2:

> "A housing provider has a policy of requiring tenants to come to the rental office
> in person to pay their rent. A tenant has a mental disability that makes her afraid
> to leave her unit. Because of her disability, she requests that she be permitted to
> have a friend mail her rent payment to the rental office as a reasonable
> accommodation. The provider must make an exception to its payment policy to
> accommodate this tenant."

This is how the events should have transpired between Plaintiff and DHA.  Plaintiff

shouldn't be forced back into court to maintain rights as a disabled individual.

18.     That the entire agency has totally stopped communicating with Plaintiff indicates

this is a policy of DHA.  In December 2021, the amount of rent Plaintiff pays vs. DHA

was increased in violation of regulations presumably in retaliation for the issues

regarding the po box between Plaintiff and DHA and they didn't think they needed to

inform Plaintiff. **Attach 2** was provided to Plaintiff by her landlord.  Plaintiff sent a letter

to the Director of the Housing Voucher Program, Ms. Owens on Nov 2, 2021, and

8

suggested as an alternative to sending mail to her at her po box which they have refused to do, that they could call her and she would pick up any written matter if they leave it with their receptionist. Plaintiff got no response. Plaintiff sent a letter to the 504 Coordinator on Jan 22, 2022 about the extra $21 Plaintiff is paying per month and received no reply.

19.     Between Oct 26 and 28 of 2021, Plaintiff contacted the DHA attorney because her address was on the stipulation and she had misunderstood and thought everyone at housing was going to use her mailing address mainly because she was very affected by the whole voucher-related event. This was his response, "Until your request to receive mail at a po box is approved by DHA's 504 Coordinator, DHA's HCV staff will not be advised to change their current policies and procedures related to your participation in the HCV program." **(Attach 3)** We can ask him what he means by this statement but Plaintiff reads it to mean they won't send mail to her po box. That is the policy in dispute. He doesn't say anything about phone calls or email, so DHA staff can't claim their attorney told them to cease all communication unless he told them something different than what he told Plaintiff. Plaintiff doesn't want to use a complicated email system. It took Plaintiff about 20 minutes to supposedly set up an account in their new system. They have a big bold statement: don't lose your password. Plaintiff always loses passwords and has certainly lost that one. Plaintiff has no idea where she wrote it. Her son is going to set up a password manager program for her soon. Plaintiff is hopeful Defendants' attorney is not using the complicated email system.

20.     Plaintiff sent a letter to the 504 Coordinator January 22, 2022 regarding the extra

$21 rent she is being required to pay (and appears to be a retribution issue not in

accord with the law) and did not receive a response to that letter. **Attach 4** shows

Plaintiff's landlord indicates Plaintiff is to pay $54/mo. to him for utilities and only pays

electric separately.  Plaintiff thinks that amount is estimated on DHA utility chart at $35.

So plaintiff's rent is $1,200, landlord utilities $54, and elec estimated at $35 for a total

$1,289. The maximum payment standard is $1,304 for FY2022. The DHA is setting

Plaintiff's rent using estimates for all the utilities the landlord pays instead of using the

known amount Plaintiff actually pays the landlord and then says Plaintiff's rent and

utilities exceed $1,304 by $21 which they require her to pay.

21.     Plaintiff thought all the problems were solved when she filed suit in this Court last

September and got back into the housing voucher program in September 2021 after

having been put out illegally by two employees, but communication problems existed

then that Plaintiff didn't even realize, and they still continue.  Plaintiff pretty much lost

whatever ability she had to think clearly at the time of that suit and the stress has

continued and has been building significantly due to the length of time she is being

frozen out by DHA.          Attach 5

22.     In the information the 504 Coord sent to Plaintiff on Sept. 21, 2021, they want

Plaintiff's current doctor to determine if Plaintiff is disabled and state that the physician

needs to, "verify that the impairment meets the legal definition of disability." (pg. 1 para

3; and pg.ii, para.2) Plaintiff's doctor is not also a lawyer. Plaintiff is already determined

to have been disabled by the Social Security Administration who provide her sole

10

income due to the fact that she cannot work (a major life activity) and we can probably take judicial notice that they have more demanding standards of someone being determined to be disabled than under the Americans with Disabilities Act of 1990 (ADA). DHA is aware that her sole income is Soc Sec Disab Income.

23.      A person is not required to put their request in writing, but DHA says, "the individual or their legal representative *must* sign the forms." (emphasis added) (pg i, sec 6) and "DHA does not require that an individual use the Request for Accommodation packet. However, in most cases, failure to use DHA's forms will delay the accommodation request as additional information is often necessary from the individual or the individual's health care provider to verify the disability, or the relationship between the disability and the accommodation requested." (pg.i, sec 7) "In most cases, DHA requires that an individual's health care provider provide information regarding why the requested accommodation is necessary for the qualified individual with a disability to have an equal opportunity to participate in, or benefit from DHA housing, programs, services or activities." (pg.i, sec 9)  The forms aren't required, but "You must complete this form" on the page labeled Request for Accommodation Packet. (pg ii, step 1, form 1)  "If an individual refuses to sign the form authorizing DHA to contact the Health Care Provider to verify or obtain necessary information, DHA may be unable to verify whether the requested accommodation is necessary based on the individual's disability and the request may be denied. DHA has twenty (20) business days in which to respond to your request. **Please note that DHA makes every attempt to respond promptly, so phone calls regarding the status of your application further delay the review**

**process for all applicants."** (emphasis in the original) (pg. ii, last para.) , **"NOTICE OF AVAILABILITY OF ALTERNATIVE FORMS OF COMMUNICATION**" (emphasis in original). They have a separate "Request for an alternative form of communication form" Since that is what Plaintiff is requesting, she is perplexed that they didn't send that one. (pg. iii, last para.) On page 5 it says they are required to provide reasonable accommodations to qualified program applicants or participants of Sec 8…DO NOT provide medical records, or specify the Applicant's disability, or provide any specific details about the nature of the disability in your response. DHA requires documentation of the manifestation of the disability that causes a need for the requested accommodation." (pg 5., para 2)  Plaintiff isn't sure by writing these quotes if someone can perceive what is wrong with the statements being made, but at trial Plaintiff can explain what makes them inappropriate.

24.     There is more.  There are a total of 15 pages.  Seven of those are for the doctor to fill out. Plaintiff does not know where anyone would find a doctor willing to look at seven pages of anything. Plaintiff's cover letter when she sent the 504 Coord her doctor's statement (**attach 1**) says neither she nor her doctor have any additional information other than the letter of May 2, 2021 and Plaintiff's complaint filed Sept 7, 2021. There is quite a lot of information in the 3 items the 504 Coord had to look at. Without informing Plaintiff, the 504 Coord sent a letter to Plaintiff's doctor. Plaintiff had not signed any type of release nor did she fill out any of the illegal forms she was sent. Plaintiff contacted defendants' attorney when it had been a while without getting a response on her accommodation request, who told Plaintiff the 504 Coord had sent a

letter to her doctor but had not received a response.(**attach 3**).The package of forms

the 504 Coord sent is at **Attach 5.**  Notice on doctor's signature page, the last page of

them all. It is the best reflection of the degree of misunderstanding of the 504 Coord in

regard to accommodations.

25.     Defendants violated the stipulation four times if Plaintiff's interpretation of the

Stipulation language is correct. Item 3. in the stipulation says "Within ten (10) business

days of this Joint Stipulation, Defendant's 504 Coordinator will respond to Plaintiff's

letter dated May 2, 2021,  by email at calatimore@gmail.com and by mail to 951 20th

St. Box 2893, Denver, Colorado 80201 (Plaintiff's prior mailing address). First they sent

Plaintiff a packet of papers to her po box, but didn't also send the information via email.

Having things in the email is helpful because the Plaintiff only picks up mail a few times

a month. Defendants' attorney wrote the stipulation stating coordination on their part

would be in regular mail and email to coordinate the matter regarding Plaintiff's May 2,

2021 letter.  And finally, the 504 Coord never sent Plaintiff a copy of a letter she sent

Plaintiff's doctor but misrepresented having done so as discussed in Plaintiff's Rule 60

Motion, Relief from Stipulation and Order.

26.     Someone with Plaintiff's known limitations needs safety procedures to protect her

mail. What if she forgets to check mail for five days?  She doesn't want another thing to

worry about and she doesn't want to go sit in front of the mailboxes every day to make

sure her property isn't tossed in the lobby of her apartment building.  This isn't complex

and shouldn't matter in the least to the housing office,  There is NO rational basis to

13

worry about where Plaintiff gets mail and yet for the second year in a row due to receiving mail at her po box they find it acceptable to NOT send Plaintiff any renewal documents for FY2023, not to call her to pick up any information, or help her figure out how to have email correspondence without requiring technical knowledge.

27.    Plaintiff was only a few weeks from being homeless when she filed suit in 2021. The defendants' attorney didn't want to see a copy of the complaint until he was served. The pressure was intense.  Plaintiff had not received documents from the housing office for her housing for the period beginning Oct 1, 2021 (FY 2022). Typically she only has to sign a few places, indicate her bank balances and send copies of her medical receipts. Since Plaintiff's landlord had requested a rent increase last year, a 'rent reasonableness' test had to be done. There are units in Plaintiff's building virtually identical to hers so figuring out if Plaintiff's rent is comparable takes an email to Plaintiff's landlord to get an email from him to see what the rates of rentals have been most recently for units like Plaintiff's. On Plaintiff's request, he informed her that the most recent similar units were rented one in August 2021 for $1,300 and two in Sept 2021 for $1,243 & $1,224.  It can't take more than an hour to tabulate the medical receipts, use a few formulas and generate the amount of rent that Plaintiff will pay and that the agency will pay.  This mailing was 10 pages and there was no problem emailing it immediately after Plaintiff contacted them Sept 2, 2021. It isn't rational that Ms. Trujillow didn't email it in the first place. (This was prior to the new email system.)

28.    And now again, Plaintiff is weeks from the end of her lease.  Plaintiff needs to receive whatever documents she needs to sign from the housing office asap so she can

14

sign her lease hopefully by August 13, 2022 and be situated by Oct 1, 2022 to have the new lease period begin.  But now instead of a conspiracy, it could be Ms. Owens blocking all communications to Plaintiff. Per 28 CFR 35.160(a)(1), "A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."  .

## IV.    PRIOR CASE IN THIS COURT IN SEPTEMBER 2021 1-21-cv-02431-GPG.

29.    These are the same defendants as in the suit in Sept 2021 except DHA as an entity and the 504 Coordinator (504 Coord) at DHA have been added as a defendants. The relief requested in Plaintiff's complaint in September 2021 identified on the 11th page, is as follows:

V. Relief Requested:

A.    Specific performance in having the agency maintain Plaintiff's housing benefits.

B.    If the cancellation acts of defendants result/resulted in the termination of funds from Michigan, Plaintiff requests the court to order them to get those back from Michigan or replace them. [Plaintiff moved to Denver from Michigan in Oct 2020.]...Plaintiff needs the court to order the cooperation and coordination by the housing office to effectuate this.

C.    Plaintiff needs a permanent injunction against defendants pursuing actions that would put Plaintiff's housing in jeopardy. Plaintiff requests an order such that no

15

attempts at retaliation or coercion are pursued by the housing agency. That is specifically made a legal violation in 42 U.S.C. 12203.

D.      Plaintiff requests a court order that the housing agency send mail to where Plaintiff receives mail and to send an email to Plaintiff so she picks up any correspondence in a timely way. [That was prior to the complicated email system which is shown at **Attach 7**.]

E.      Plaintiff requests that the court order defendants to pay any costs due to the court for this case and that they pay Plaintiff's expenses to include costs for printing, copies, and computer use and transportation to fedex, the court and the housing office. These are provided for in disability cases under 42 U.S.C. 12205.

30.     **JOINT STIPULATION OF DISMISSAL WITH PREJUDICE**

Signed by Plaintiff and attorney of DHA for defendants on September 16, 2021 contains the following:

In the first paragraph, each party to pay their own expenses.

1.      Within one (1) business day Plaintiff will be reinstated to the Housing Voucher Program.

2.      Within two days Plaintiff's landlord will be notified of Plaintiff's continued participation in the Voucher Program. [Defendants had notified Plaintiff's landlord they had canceled her housing voucher but hadn't told her.]

3.      Within 10 business days, Defendants' 504 Coordinator (504 Coord) will respond to Plaintiff's letter dated May 2, 2021, by email at calatimore@gmail.com and by mail to

16

951 20th St. Box 2893, Denver, Colorado 80201. [plaintiff's former mailing address] [Plaintiff had read this to understand that in any coordination in the process that Plaintiff would receive through regular mail, and through email since Plaintiff does not normally pick up mail more than several times a month.]

## V.    RES JUDICATA AND COLLATERAL ESTOPPEL

31.    The stipulation getting Plaintiff back into the housing program was signed with prejudice but Plaintiff had no full and fair opportunity to look at anything at that time in terms of legal rights. Plaintiff was worried about imminently living in a tent.  Plaintiff could not really process the whole thing that was going on.

32.    "The basic distinction between the doctrines of res judicata and collateral estoppel, as those terms are used in this case, has frequently been emphasized. Thus, under the doctrine of res judicata, a judgment "on the merits" in a prior suit involving the same parties or their privies bars a second suit based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, such a judgment precludes relitigation of issues actually litigated and determined in the prior suit, regardless of whether it was based on the same cause of action as the second suit." *Lawlor v. National Screen Service Corp.*, 349 US 322, 326 (1955). In Plaintiff's case, nothing was litigated or decided "on the merits" in the case in Sept 2021.

33.    The crux of this suit came into Plaintiff's hands on *Oct 6, 2021* in the form of an email to Nicole Matteo from Gina Holloway instructing her on July 14, 2021 to email

17

certain documents to Plaintiff. **Attachment 8** . Plaintiff did not receive an email from Ms. Matteo on July 14, 2021 or any other time. *Plaintiff could not have put this complaint together prior to signing the stipulation on Sept 16, 2021*. At the time Plaintiff signed the stipulation, she didn't know what exactly had happened in terms of the voucher cancellation. It took time to work it out. Because Plaintiff was still numb from the cancellation, and then was preoccupied at the start of October 2021 in being told different amounts of what the rent was going to be between the housing office and Plaintiff's landlord. The Defendants' attorney emailed Plaintiff the documents she was supposed to have received on July 14, 2021 from Ms. Matteo. The same email where the subject line was given instructions to email it to Plaintiff also contained the information for Ms. Mattao to mail the information to Plaintiff's landlord so that it could be seen that he was supposed to have been told of the $1,103, in spite of her landlord telling Plaintiff he was not aware of that information showing the rent as $1,103 and said he only knew it as $1,200, he later admitted he received those documents that showed $1,103 that the email showed Ms. Matteo was instructed to mail in the same email where she was told to email the documents to Plaintiff.  At that time in early October 2021, Plaintiff was only noticing what was in the email related to the communication to her landlord. It was only in June 2022 that the Plaintiff, in the process of organizing files saw in the email from Holloway to Matteo that Matteo had been also instructed to *email* the package along with the annual renewal paperwork to Plaintiff. If Plaintiff had had those documents, she would have been able to sort out the rent reasonableness issue before the rent was due in October, and she would have had the papers needed to

submit for FY 2022 voucher support on time, her voucher would not have been canceled, and there would have been no lawsuit last September. It sounds crazy that Plaintiff would not have noticed such a thing then, but Plaintiff was still numb from the events that had transpired and couldn't concentrate on anything at that time. Additionally, if you look at the email, visually it's very busy and distracting to look at. The Stipulation was supposed to solve everything but it didn't. It was all too much to handle.

34.    Plaintiff had spoken with the DHA attorney and agreed with him it was fine with her to get a statement from her doctor. Plaintiff's doctor provided a statement indicating some of Plaintiff's limitations. Although Plaintiff has been in treatment for about two decades, she was quite stable having been taking the same medications for years.

35.    DHA is trying to make getting accommodations into a high hurdle in conflict with regulations. In 28 CFR 35.108(a)(2)(i) the definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. Per 28 CFR 35.108(d)(1)(ii) "The primary object of attention in cases brought under title II of the ADA should be whether public entities have complied with their obligations and whether discriminaiton has occurred, not the extent to which an individual's impairment substantially limits a major life activity.  Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis."

36.    These actions and activities all happened after the stipulation was signed–to include receiving the email Oct 6, that showed the same person who failed to email

19

Plaintiff the information is the same person who canceled Plaintiff's voucher for not responding to what she didn't send.

## VI.   FULL AND FAIR OPPORTUNITY TO LITIGATE PLAINTIFF'S CLAIMS

37.   There were beautiful descriptions of the hardships and challenges in the lives of disabled people in *Tennessee v. Lane*, but the holding in the case won't apply to many of them. *Tennessee v. Lane,* 541 US 509, 531 (2004)   "Because we find that Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services, we need go no further. See *United States* v. *Raines,* 362 U. S. 17, 26 (1960)" *Tennessee v. Lane* at 531.

38.   The Plaintiff in Tennessee was an individual who used a wheelchair and had to be carried upstairs to be able to attend a court hearing. The vast majority of cases in the courts that Plaintiff has seen are about accommodations for users of wheelchairs and other mobility devices. Those who are mentally impaired individuals find it very difficult to try to interact with the court system.  It's nice that the law allows attorney fees, but how many mentally disabled people can afford lawyers and where do the lawyers exist who want to gamble on getting attorney fees at the conclusion of this type of case? Plaintiff made a number of unsuccessful efforts to obtain legal assistance before giving up. Plaintiff has a very strong tendency to repeat things–likely one of the reasons this complaint is long. Her memory doesn't distinguish whether she is reading something already read in the same document or if she is just remembering because she read the

whole thing too many times. Also, Plaintiff is afraid not to be fairly comprehensive, having seen many cases decided on the pleadings alone.

39.     Plaintiff never had a full and fair opportunity to consider any claims at the time her voucher was taken away without her knowledge. Plaintiff's primary concern after that was getting back in the program. Plaintiff had confidence that since the letter Plaintiff sent Ms. Trujillo on May 2, 2021 was at that point known by others, surely it was just a matter of getting a doctor support letter, and her address was on the stipulation, so wasn't the housing department going to be using it? Plaintiff's brain was fried. She was numb. She only glanced at the stipulation. Plaintiff was 2 weeks from living in a tent on the street when it was signed.

40.     "But one general limitation the Court has repeatedly recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a "full and fair opportunity" to litigate that issue in the earlier case. *Montana v. United States*, supra, at 153; *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, supra, at 328-329." *Allen v. McCurry*, 449 US 90, 95 (1980).


## VII. THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

41.     The pertinent text of the Fourteenth Amendment provides:

> "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which

shall abridge the privileges or immunities of citizens of the United States;

*nor shall any State deprive any person of life, liberty, or property, without*

*due process of law;* nor deny to any person within its jurisdiction the equal

protection of the laws." (Emphasis supplied.)

**Section 4, Privileges and Immunities Clause**.

42.     "Privileges or Immunities Clause, "Shellabarger relied on the statement of Mr.

Justice Washington in Corfield v. Coryell, 4 Wash. C. C. 371 (CC ED Pa. 1825), which

defined the privileges protected by Art. IV: "`What these fundamental privileges are[,] it

would perhaps be more tedious than difficult to enumerate. They may, however, be all

comprehended under the following general heads: protection by the

Government;'—"Mark that—"`protection by the Government; the enjoyment of life and

liberty, with the right to acquire and possess property of every kind, and to pursue and

obtain happiness and safety . . . .'" Globe App. 69 (emphasis added)," quoting *Corfield*

*v. Coryell,* 4 Wash. C. C. 371 (CC ED Pa. 1825)., at 380-381.*" Monell v. NYC Dep't of*

*Social Services*, 436  U.S. 658, 670 (1978)..

44.     "The extent to which procedural due process must be afforded the recipient is

influenced by the extent to which he may be "condemned to suffer grievous loss," *Joint*

*Anti-Fascist Refugee Committee v. McGrath*, 341 U. S. 123, 168 (1951) (Frankfurter, J.,

concurring), and depends upon whether the recipient's interest in avoiding that loss

outweighs the governmental interest in summary adjudication." *Goldberg v. Kelly, 397*

*U.S. 254,* at 262-263 (1970). There is no doubt that grievous loss was intended for

Plaintiff by the Conspirators in this case in 2021, and there was no government reason

for their actions. The same as there is no reason for their actions in shutting down

communications with Plaintiff this year.

45.     In the case *Goldberg v. Kelly,* a person receiving welfare was being put out of

that program and the agency was going to provide a hearing after the fact. The Court

expressed that a person who needs the funds to live and might still be eligible will not

be able to pursue their rights because their survival is at stake. So the Court determined

in this type of situation, there must be procedural due process prior to termination of

benefits. *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970).  "'While post-termination

review is relevant, there is one overpowering fact which controls here. By hypothesis, a

welfare recipient is destitute, without funds or assets. . . . Suffice it to say that to cut off a

welfare recipient in the face of . . . `brutal need' without a prior hearing of some sort is

unconscionable, unless overwhelming considerations justify it.' *Kelly v. Wyman,* 294 F.

Supp. 893, 899, 900 (1968)." *Goldberg* at 261.

46.     It was noted that anyone who qualifies receives benefits under that welfare

program. The housing voucher program cannot accept the number of people who would

qualify, but there are specific reasons which are permitted for a person's voucher to be terminated. Those include criminal activity and illegal drug use. Getting mail at a po box is not one of the reasons identified.

47.    In *Mathews v. Eldridge*, 424 US 319, 325-326 (1976), on finding the case to be like *Goldberg v. Kelly* where welfare benefits were terminated prior to a hearing, both the district and appeals court found a pre-termination hearing was required and Plaintiff's procedural due process rights were violated in that case. The Supreme Court disagreed. *Id.* at 326. The facts were different in that case, "[T]he agency (state agency coordinating distribution of Social Security Disability benefits) informed Eldridge by letter that it had made a tentative determination that his disability had ceased in May 1972. The letter included a statement of reasons for the proposed termination of benefits, and advised Eldridge that he might request reasonable time in which to obtain and submit additional information pertaining to his condition." Nothing of the sort happened in Plaintiff's case. She was completely blindsided and found out after the fact that her voucher had been cancelled . "Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldrige* at 332. " He (Mathews, Secretary of Health, Education and Welfare) recognizes, as has been implicit in our prior decisions, e. g., *Richardson v. Belcher,* 404 U. S. 78, 80-81 (1971); *Richardson v. Perales,* 402 U. S. 389, 401-402 (1971); *Flemming v. Nestor*, 363 U. S. 603, 611 (1960), that the interest of an individual in continued receipt of these benefits is a statutorily created "property" interest protected

by the Fifth Amendment." *Id.* "This Court consistently has held that some form of

hearing is required before an individual is finally deprived of a property interest. *Wolff v.*

*McDonnell,* 418 U. S. 539, 557-558 (1974). See, e. g., *Phillips v. Commissioner,* 283 U.

S. 589, 596-597 (1931)." *Id.* at 333. The "right to be heard before being condemned to

suffer grievous loss of any kind, even though it may not involve the stigma and

hardships of a criminal conviction, is a principle basic to our society." *Joint Anti-Fascist*

*Comm. v. McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring).

48.     "The fundamental requirement of due process is the opportunity to be heard "at a

meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U. S. 545, 552

(1965). See *Grannis v. Ordean*, 234 U. S. 385, 394 (1914). Eldridge agrees that the

review procedures available to a claimant before the initial determination of ineligibility

becomes final would be adequate if disability benefits were not terminated until after the

evidentiary hearing stage of the administrative process." *Id.*

49.     "[O]ur prior decisions indicate that identification of the specific dictates of due

process generally requires consideration of three distinct factors: First, the private

interest that will be affected by the official action; second, the risk of an erroneous

deprivation of such interest through the procedures used, and the probable value, if any,

of additional or substitute procedural safeguards; and finally, the Government's interest,

including the function involved and the fiscal and administrative burdens that the

additional or substitute procedural requirement would entail. See, e. g., *Goldberg v.*

*Kelly*, supra, at 263-271." *Id.* at 334-335. The first issue in Plaintiff's case is that the

private interest of Plaintiff's from the action of terminating her voucher is that Plaintiff

25

would be rendered homeless. They know how low her income is at 30% of the median income for Denver. Second, the risk of erroneous deprivation is high since there appears to have been a clandestine element at play in this case and Plaintiff got no notice whatsoever, prior or post voucher cancellation. Ms. Owens knows right now that she is driving Plaintiff toward homelessness again. There needs to be some very strong screening processes established so that no employees can do this to someone out of spite or revenge. If Ms. Owens knew what they were doing in 2021 in canceling Plaintiff's voucher, she should have at least made a phone call to Plaintiff. Plaintiff received her voucher in 2007 and she's going to suddenly ignore signing a few papers and mailing her medical receipts?  Ms. Owens believed that?  That doesn't pass the smell test. And what happened to Ms.Trujillo after the case last Sept, and to Ms. Matteo?  Did Ms.Owens reprimand them? fire them? promote them? just do nothing? There were essentially no financial or administrative burdens to be avoided by their actions. The PHA in Michigan was paying the co-pays for Plaintiff's voucher. There could be an effect of their escapades if they canceled the money coming from Michigan and now have to fund Plaintiff's voucher from Denver money. Otherwise, there is no difference for them. Devastation for Plaintiff and they are doing the same thing this year, except instead of a clandestine conspiracy, it's just Ms.Owens showing either malice or reckless disregard to Plaintiff's disability. Perhaps it's because Denver did have to pick up the cost of Plaintiff's voucher that it would be expedient to get rid of her this year.

## VIII.   CLAIMS

**CLAIM 1**

**50.    42 USC 1985(3)  Conspiracy to interfere with Civil Rights; Depriving citizens of Rights and Privileges,** Violations by Angie Trujillo and Nicole Matteo, as individuals and employees of DHA. $500,000 damages claim for pain and suffering from each of them for their well-established participation in a conspiracy of deliberate intent to harm Plaintiff and they did harm Plaintiff.

Potentially also this claim is against Ms. Loretta Owens if she was involved in canceling Plaintiff's voucher. In which case Plaintiff requests damages in the amount of $500,000 from her also.

And against anyone who might be found who knew of the conspiracy and did nothing to stop it.  If anyone is identified in discovery or otherwise, Plaintiff requests to amend her complaint to include such individuals.  Plaintiff requests additional damages of $500,000 from each of those for pain and suffering if anyone culpable is identified.

**51.  §1988. Proceedings in vindication of civil rights**

**(a) Applicability of statutory and common law**

The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such

laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

**(b) Attorney's fees**

In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C. 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C. 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or section 12361 of title 34, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

**(c) Expert fees**

In awarding an attorney's fee under subsection (b) in any action or proceeding to enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee.

28

52.    It took some time, but Plaintiff finally understood what most likely caused the illegal behavior. When Plaintiff spoke to her housing representative, Ms. Trujillo, January 15, 2021 on the telephone Plaintiff directly after that made a memorandum that states: "She said I signed something saying that I would not use a po box because it is not permitted in the program." Plaintiff found this in the Denver Housing Admin Plan only identified under communication in request for accommodations. She asked to use po box as accommodation for disability because getting mail daily is stressful.  She said she would send a letter or complete a form if she needed that. "This is NOT a letter, it's an accommodation for disability request". Said she will check with her supervisor..She was likely further offended from the letter Plaintiff sent her dated May 2, 2021, wherein Plaintiff cited the law indicating what DHA's responsibilities were in granting Plaintiff accommodations, and that these were unaffected by a statement incorporated by reference in one plaintiff signed upon moving to Denver that stated they would not send mail to a po box. Plaintiff was being in her mind 'direct' because that's how she is, she meant no offense. It happened Plaintiff was quoting the section wherein HUD has to abide disability regulatons. The ones for local and state entities are in the prior section but are essentially the same. In September, it didn't appear Ms. Trujillo had ever informed anyone else at DHA about Plaintiff's letter. Ms. Trujillo knowingly sent voucher renewal documents to where she knew Plaintiff did not receive mail at her residential address. The first time Plaintiff told Ms. Trujillo she does not receive mail at her apartment was in an email dated Dec 19, 2020.

53.     "We return to the petitioners' complaint to determine whether it states a cause of

action under § 1985(3) as so construed. To come within the legislation a complaint must

allege that the defendants did (1) "conspire or go in disguise on the highway or on the

premises of another" (2) "for the purpose of depriving, either directly or indirectly, any

person or class of persons of the equal protection of the laws, or of equal privileges and

immunities under the laws." It must then assert that one or more of the conspirators (3)

did, or caused to be done, "any act in furtherance of the object of [the] conspiracy,"

whereby another was (4a) "injured in his person or property" or (4b) "deprived of having

and exercising any right or privilege of a citizen of the United States." *Griffin v.

Breckenridge, 403 U.S. 88, 102-103 (1971).*

54.     "To prove a conspiracy under § 1985, a plaintiff must show `at least a

combination of two or more persons acting in concert and an allegation of a meeting of

the minds, an agreement among the defendants, or a general conspiratorial objective.'"

*Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) (citation omitted). "[A] plaintiff

must allege specific facts showing an agreement and concerted action amongst the

defendants....As we have explained: A plaintiff seeking redress need not prove that

each participant in a conspiracy knew the "exact limits of the illegal plan or the identity

of all the participants therein." "An express agreement among all the conspirators is not

a necessary element of a civil conspiracy. The participants in the conspiracy must share

the general conspiratorial objective, but they need not know all the details of the plan

designed to achieve the objective or possess the same motives for desiring the

intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was "a single plan, the essential nature and general scope of which [was] know[n] to each person who is to be held responsible for its consequences." *Frazier* at 1024-25 (alterations in original) (citation omitted) *Id*. at 1024-25 (alterations in original) (citation omitted).

55.     On Sept 2, 2021, Plaintiff contacted Ms. Trujillo, who had been Plaintiff's contact since prior to moving to Denver in Oct 2020, to find out when she was going to send the documents to sign for FYY2022.  In an email Sept 3, 2021, Ms. Trujillo claimed she had sent those to Plaintiff's residential address three times after Plaintiff had told her multiple times, she does not receive mail there. Plaintiff had at least twice in writing asked Ms. Trujillo to email her if she were going to mail anything in paper mail and she did not do that. She was able to instantly email Plaintiff 10 pages that she had somehow felt needed to be sent via paper mail when email would have been much simpler. That decision was illogical.

56.     The whole moving to Denver paperwork was done by email and a few calls. Ms. Matteo, maybe on her own, or maybe at Ms. Trujillo's request, decided to 'help out' and it is the crux of circumstantial evidence valid to establish a conspiracy.  Ms Matteo was instructed by email to email the needed documents to Plaintiff on July 14, 2021. She did not email Plaintiff. Then on Sept 1, 2021 she canceled Plaintiff's voucher for not returning the forms she failed to send via email as instructed.  Each conspirator took at least two steps to ensure the voucher was terminated. Ms. Trujillo on Sept 3 gave plaintiff an erroneous email address for Ms. Matteo after saying Plaintiff needed to

contact her about the cancellation. Plaintiff didn't find out until Sept 12, 2021 that the email to Ms. Matteo had been returned to Plaintiff's spam file.

57.     Plaintiff's box at the apartment has a card inside stating the unit is vacant. Plaintiff had to retrieve a key the landlord put in there some weeks back and there was no mail in that box. Ms. Trujillo would like us to believe that each of three times mail was undeliverable that the postal worker put it in the trash instead of returning to sender.

58.     When Plaintiff did not get a response to the May letter, Plaintiff thought it was because Ms.Trujillo had verified that Plaintiff's understanding of the law was correct.

59.     "[A]n important indication of congressional intent to speak in § 1985 (3) of *all* deprivations of "equal protection of the laws" and "equal privileges and immunities under the laws," whatever their source. The approach of this Court to other Reconstruction civil rights statutes in the years since *Collins* has been to "accord [them] a sweep as broad as [their] language." *United States v. Price,* 383 U. S. 787, 801; *Jones v. Alfred H. Mayer Co.,* 392 U. S. 409, 437." *Griffin* at 97.


**CLAIM 2**

**First Amendment Free Speech violation**

60.     THE RIGHT TO FREE SPEECH, THE FIRST AMENDMENT IN THE BILL OF RIGHTS: PLAINTIFF WAS PUNISHED BY TAKING AWAY PLAINTIFF'S  HOUSING VOUCHER WHICH ENABLES HER TO AFFORD PAYING RENT IN DENVER. The initial step in the conspiracy was Ms. Trujillo taking offense at something Plaintiff said in

a conversation on January 15, 2021 regarding her need for accommodations and a

letter Plaintiff wrote on May 2, 2021. Plaintiff indicated she needed to have

accommodations because she cannot get mail at her residence and further indicated

the housing agency is legally required to grant Plaintiff the accommodations she needs.

Her first goal in life is to try to keep her mental condition stabilized and for that she is

forced to avoid triggers for excess stress.  If it takes lawsuits to achieve her rights under

disability law, Plaintiff has no choice but to pursue them.

"Official reprisal for protected speech "offends the Constitution [because] it threatens to

inhibit exercise of the protected right," *Crawford-El* v. *Britton*, 523 U. S. 574, 588, n. 10

(1998), and the law is settled that as a general matter the First Amendment prohibits

government officials from subjecting an individual to retaliatory actions, including

criminal prosecutions, for speaking out, *id.,* at 592; see also *Perry* v. *Sindermann*, 408

U. S. 593, 597 (1972) (noting that the government may not punish a person or deprive

him of a benefit on the basis of his "constitutionally protected speech"). Some official

actions adverse to such a speaker might well be unexceptionable if taken on other

grounds, but when non retaliatory grounds are in fact insufficient to provoke the adverse

consequences, we have held that retaliation is subject to recovery as the but-for cause

of official action offending the Constitution." *Hartman v. Moore*, 547 US 250, 256 ( 2006)

"When the vengeful officer is federal, he is subject to an action for damages on the

authority of *Bivens.* See 403 U. S., at 397."..*Id..* " In an action for malicious prosecution

after an acquittal, a plaintiff must show that the criminal action was begun without

probable cause for charging the crime in the first place; the inspectors see retaliatory

prosecution under *Bivens* as a close cousin of malicious prosecution under common law, making the latter's no-probable-cause requirement a natural feature of the constitutional tort. See *Heck* v. *Humphrey*, 512 U. S. 477, 483-485, and 484, n. 4 (1994)." *Id.* at 258. "[C]ausation is understood to be but-for causation, without which the adverse action would not have been taken; we say that upon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of (such as firing the employee). See *Mt. Healthy*, 429 U. S., at 287. If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm." *Hartman* at 260.

**CLAIM 3**

### 42 USC 1983 Civil action for deprivation of rights

61.     "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Statute

62.     "Damages are also commonly available against state and local officials. In 1871, Congress passed the precursor to 42 U.S.C. 1983, imposing liability on any person

who, under color of state law, deprived another of a constitutional right." *Tanzin v. Tanvir,* 141 S. Ct. 486, 491 (2020). There is no doubt that damages claims have always been available under [Sec.] 1983 for clearly established violations of the first amendment." *Id* at 492.

63.    "[W]e now overrule *Monroe* v. *Pape, supra,* insofar as it holds that local governments are wholly immune from suit under § 1983 *Monell v. New York City Dept. of Social Servs.*, 436 US 658, 663 (1978) "Local governing bodies,therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking. channels." *Monell v NYC Dept of Social Servs*, 436 U.S. 658, 690-691 (1978).

64.    "Monell reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality" — that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. Cincinnati,* 475 US 469, 480 (1986). "Monell's language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy," *Monell*, supra, at 694, and whose

decisions therefore may give rise to municipal liability under § 1983." *Id.* at 480. "To be sure, "official policy" often refers to formal rules or understandings — often but not always committed to writing — that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time. That was the case in *Monell* itself, which involved a written rule requiring pregnant employees to take unpaid leaves of absence before such leaves were medically necessary." *Pembaur.* at 480-481. *Pembaur* goes on to talk about "by that government's authorized decision makers." The authorized decision-makers aren't all at a high level. Employees at DHA allowed first line employees to cancel Plaintiff's voucher. There was an agency policy that enabled that decision to be made at that level, unless Ms. Owens was involved in which case she should be included in the conspiracy claim. Odds are good Ms. Owens has the authority, or if not her at least Mr. Nisivoccia does, to get rid of policies about not contacting program participants due to them not getting mail at their apartment, but since Plaintiff didn't get responses from letters she sent to Ms. Owens and the 504 Coord, which are obviously different offices, and Plaintiff was not sent the Contract Change Clause that increased her rent, it is clearly an agency policy with these being 3 different sections of the organization.

**CLAIM 4     First Amendment Privacy violation**

65.     Denying Plaintiff's First Amendment privacy rights as concerns dragging her medical condition into the public record.

66.     "Petitioners appealed, and the Court of Appeals for the District of Columbia

Circuit affirmed. 207 U. S. App. D. C. 372, 647 F. 2d 197 (1981). As construed by the

Court of Appeals, Exemption 6 permits the withholding of information only when two

requirements have been met: first, the information must be contained in personnel,

medical, or "similar" files, and second, the information must be of such a nature that its

disclosure would constitute a clearly unwarranted invasion of personal privacy. *Id.,* at

373, 647 F. 2d, at 198." *Department of State v. Washington Post Co.*, 456 US 595, 598

(1982).

67.     "After referring to the "great quantities of [Federal Government] files containing

intimate details about millions of citizens," the House Report explains that the exemption

is "general" in nature and seeks to protect individuals: "A *general exemption* for [this]

category of information is much more practical than separate statutes protecting each

type of personal record. The limitation of a `clearly unwarranted invasion of personal

privacy' provides a proper balance between the protection of an individual's right of

privacy and the preservation of the public's right to Government information *by

excluding those kinds of files the disclosure of which might harm the individual.*" H. R.

Rep. No. 1497, 89th Cong., 2nd Sess., 11 (1966) (emphasis added)." *Dep't of State @*

599.

68.     Similarly, the Senate Judiciary Committee reached a "consensus that these

[personal] files should not be opened to the public, and . . . decided upon a *general

exemption* rather than a number of specific statutory authorizations for various

agencies." S. Rep. No. 813, 89th Cong., 1st Sess., 9 (1965) (emphasis added)."
*Department of State v. Washington Post Co.*, 456 US 595, 599 (1982).

69.    "In sum, we do not think that Congress meant to limit Exemption 6 to a narrow

class of files containing only a discrete kind of personal information. Rather, "[t]he

exemption [was] intended to cover detailed Government records on an individual which

can be identified as applying to that individual." H. R. Rep. No. 1497, *supra*, at 11. When

disclosure of information which applies to a particular individual is sought from

Government records, courts must determine whether release of the information would

constitute a clearly unwarranted invasion of that person's privacy."

*Department of State v. Washington Post Co.*, 456 US 595, 602 (1982).  Plaintiff here

doesn't have a choice but to discuss her private mental health issues in the public

record.  There would be no way to seal the entire case and Plaintiff doesn't see what

could be shielded by itself that would make a difference.


**CLAIM 5**

## THE FOURTH AMENDMENT

70.    "The right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures, shall not be violated . . . ." Text of

the Amendment.  Plaintiff has the right to protect her property, and that cannot happen if

Plaintiff gets mail at her residence.

71.    "Respondents seek to treat the relationship between a citizen and a federal agent

unconstitutionally exercising his authority as no different from the relationship between

two private citizens. In so doing, they ignore the fact that power, once granted, does not disappear like a magic gift when it is wrongfully used. An agent acting—albeit unconstitutionally—in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own. Cf. *Amos* v. *United States, 255 U. S. 313, 317 (1921)*; *United States* v. *Classic, 313 U. S. 299, 326 (1941)*". *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 391-392 (1971).

72.     "For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See *Lewis v. United States*, 385 U. S. 206, 210; *United States v. Lee,* 274 U. S. 559, 563. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. See *Rios v. United States,* 364 U. S. 253; Ex parte Jackson, 96 U. S. 727, 733." *Katz v. United States,* 389 US 347, 351-352 (1967). (Congress codified Elec Surveillance Law) N/A here

73.     "That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. See *Nixon* v. *Condon, 286 U. S. 73 (1932)*;  *Nixon* v. *Herndon, 273 U. S. 536, 540 (1927)*; *Swafford* v. *Templeton, 185 U. S. 487 (1902)*; *Wiley* v. *Sinkler, 179 U. S. 58 (1900)*." *Bivens* at 395-396

74.     "[T]he Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation. But "it is . . . well

settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell* v. *Hood, 327 U. S., at 684*."

*Bivens* at 396.

75.     If Plaintiff's property would go missing if she changes her postal delivery address to her apartment, are Defendants prepared to face liability for that occurrence? damages? Will Defendants argue on Plaintiff's behalf at Plaintiff's pharmacy to replace it if a prescription with a controlled substance goes missing due to being thrown in the building entryway if the box was full. Are Defendants prepared to pay for any property that goes missing? If the same property is no longer available, then damages can exceed the dollar value of the original item. "That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. See *Nixon v. Condon*, 286 U. S. 73 (1932); *Nixon v. Herndon*, 273 U. S. 536, 540 (1927); *Swafford v. Templeton*, 185 U. S. 487 (1902); *Wiley v. Sinkler,* 179 U. S. 58 (1900)" *Bivens* at 395-396.

**Claim 6**

## FUNDAMENTAL RIGHTS AND THE NINTH AMENDMENT

76.     "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state programs, including systematic deprivations of fundamental

rights." *Tennessee v. Lane* at 524. Being able to get one's mail at the place most appropriate for them where they are able to secure their property is surely a fundamental right. "Due process of law thus conveys neither formal nor fixed nor narrow requirements. It is the compendious expression for all those rights which the courts must enforce because they are basic to our free society. But basic rights do not become petrified as of any one time, even though, as a matter of human experience, some may not too rhetorically be called eternal verities. It is of the very nature of a free society to advance in its standards of what is deemed reasonable and right. Representing as it does a living principle, due process is not confined within a permanent catalog of what may at a given time be deemed the limits or the essentials of fundamental rights." *Wolf v. Colorado,* 338 US 25, 27 (1949). (overturned other grounds)

77.     Since there is no federal or state or executive agency law about where someone should get their mail that Plaintiff could find, other than people who are incarcerated, there is no rational reason by DHA to remove the right for Plaintiff to protect her mail and is a violation of the Ninth Amendment. "To rely on a tidy formula for the easy determination of what is a fundamental right for purposes of legal enforcement may satisfy a longing for certainty but ignores the movements of a free society. It belittles the scale of the conception of due process. The real clue to the problem confronting the judiciary in the application of the Due Process Clause is not to ask where the line is once and for all to be drawn but to recognize that it is for the Court to draw it by the gradual and empiric process of "inclusion and exclusion." *Davidson v. New Orleans*, 96 U. S. 97, 104.

78.     "The principles laid down in this opinion affect the very essence of constitutional

liberty and security. They reach farther than the concrete form of the case then before

the court, with its adventitious circumstances; they apply to all invasions on the part of

the government and its employees of the sanctity of a man's home and the privacies of

life.

It is not the breaking of his doors, and the rummaging of his drawers, that

constitutes the essence of the offense; but it is the invasion of his indefeasible right of

personal security, personal liberty and private property, where that right has never been

forfeited by his conviction of some public offense, — it is the invasion of this sacred right

which underlies and constitutes the essence of Lord Camden's judgment." *Weeks v.*

*United States*, 232 US 383, 391 (1914) quoting Boyd v. United States, 116 US 616, 630 (1886).

Some of the impetus for enacting the Americans with Disabilities Amendments Act were

the cases; *Sutton v. United Airlines*, 527 U.S. 471 (1999) (overruled by statute), and

*Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) (overruled

by statute) . These were both cases in courts determining disability and

otherwise/qualified issues. Neither of those are at issue in this case. But the perception

of Congress was that courts were trying to screen out individuals from being given

accommodations and the intention of the law was the opposite. The 504 Coord at DHA

should be helping Plaintiff get accommodations, not fight against her ability to have

them.

80.     Where Plaintiff gets mail has absolutely nothing to do with the housing voucher

program. For seven years before her move to Denver, Plaintiff used a po box and it

worked fine.  She is required to pay $48/ea. 3 mo. to have a po box, and she has to walk .7 miles to check her mail. (& .7 mi. home for a total of 1.4 miles). Plaintiff knows why it matters to her, but can't fathom how it matters to DHA at all. This is a personal liberty right not available to the government.  The rights not designated in the Constitution to either the state or federal statutes were left to the citizens in the Ninth Amendment.

**CLAIM 7**

**Discrimination and accommodations under the American with Disabilities Act and Americans with Disabilities Amendments Act.**

81.     The following is from the Department of Housing and Urban Development and the Department of Justice, May 17, 2004, Reasonable Accommodations under the Fair Housing Act: Item 6. on page 6. What is a "reasonable accommodation" for purposes of the Act? A "reasonable accommodation" is a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability *to have an equal opportunity to use and enjoy* a dwelling, including public and common use spaces. [emphasis provided] Since rules, policies, practices, and services may have a different effect on persons with disabilities than on other persons, treating persons with disabilities exactly the same as others will sometimes deny them an equal opportunity to use and enjoy a dwelling. The Act makes it unlawful to refuse to make reasonable accommodations to rules, policies, practices, or services when such accommodations

may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling.

82.     "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 201, as set forth in 42 U. S. C. § 12132. *Olmstead v. LC,* 527 US 581, 589-590 (1999).

83.     Title II's definition section states that "public entity" includes "any State or local government," and "any department, agency, [or] special purpose district." §§ 12131(1)(A), (B). The same section defines "qualified individual with a disability" as"an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2). *Id.* Plaintiff has been participating in the voucher program for years and that meets the 'otherwise qualified' component of the test.

**42 USC 12201  Construction  (f) Fundamental alteration**

84.     Nothing in this chapter alters the provision of section 12182(b)(2)(A)(ii) of this title, specifying that reasonable modifications in policies, practices, or procedures shall be required, unless an entity can demonstrate that making such modifications in policies, practices, or procedures…, would fundamentally alter the nature of the goods,

services, facilities, privileges, advantages, or accommodations involved. Again, this statement means it is for DHA to defend the reason they declined, not for Plaintiff to defend in light of the information Defendants hold, and were told in Plaintiff's cover letter with her doctor statement it said more justification was in Plaintiff's complaint in the Sept case and in the letter of May 2, 2021 (1st attachment in that complaint).

85.     There is no legitimate reason the 504 Coordinator and the Director of the Housing Voucher Program would not know disability laws and that a primary requirement is maintaining communications with participants. How could they function in their positions without such basic knowledge? Anyone working with the housing voucher program knows how difficult they are to get and the degree of loss to a program participant that occurred and was fortunately saved before the final ax fell. Ms. Trujillo and Ms. Matteo knew full well what they were doing was an egregious harm and did it together as a conspiracy or at least individually if the Court doesn't agree that there was a conspiracy.. Ms. Owens and the 504 Coordinator for this year are acting with at least reckless indifference which still renders them liable to a violation of 42 USC 1983. "[W]e are content to adopt the policy judgment of the common law — that reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages. See *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 233 (1970) (BRENNAN, J., concurring and dissenting). *Smith v. Wade,* 461 US 30, 51 (1983). Therefore, the Court takes very seriously the acts being committed by Ms. Owens and Ms. Pineda, even if their acts are not done with malice.

86.    Denver Housing Authority, the director of the Housing Voucher Program, Loretta

Owens, and Housing Voucher Program employees, (Sec 8) Nicole Matteo and Angie

Trujillo know that Plaintiff is disabled. Plaintiff gets a disability deduction in determining

her adjusted income annually and Plaintiff's sole income is Social Security Disability

Income (SSDI). Plaintiff is otherwise qualified for the Program, Plaintiff received her

housing voucher in 2007 and the primary issue with Denver Housing is that they don't

want to mail to the place where Plaintiff gets mail, which is at the post office in Denver.

For the seven years prior to moving to Denver, Plaintiff received her mail at a post office

box in Michigan and there were no issues about it to the staff of the housing program

there. In times prior to that, Plaintiff lived in places where there was a locked space for

mail too bulky for the box, and the last place before moving to Michigan, Plaintiff had a

private porch and didn't need to use a po box even for larger box deliveries. Nov 2,

2021, in a letter to Loretta Owens, Plaintiff suggested an alternate method of

communication in a letter to Ms.Owens offering to pick up any papers/documents from

the receptionist at the Denver Housing Office if they call her. Plaintiff did not get a

response.

87.    "Thomas suggested the following accommodation alternatives to enable him to

observe his religious beliefs: (1) maintain his route as a letter carrier and receive

Saturdays and Sundays off from work; (2) maintain his route as a letter carrier and have

a substitute carry his route on Saturdays; (3) maintain his route as a letter carrier and

have a part-time flexible or unassigned regular employee carry his route on Saturdays;

(4) maintain his route as a letter carrier with all Saturdays off from work and be available

to work on Sunday; and (5) maintain his route as a letter carrier, but only work four days a week." *Thomas v. National Ass'n of Letter Carriers*, 225 F. 3d 1149, 1153 (10th Cir. 2000). If there is a specific problem with the accommodations requested, the public entity should try to identify an alternative. See 29 USC 794a(a)(1) directing the parties to seek alternatives to the accommodations requested if needed.  So when Plaintiff suggested an alternative, there was no valid reason not to respond. Plaintiff was following the law.

88.     Per 28 CFR 35.160 A public entity shall take appropriate steps to ensure that communications with applicants, participants and members of the public are as effective as communications with others."  There is no ambiguity in the law. Per 28 USC 35.164, [A] public entity has the burden of proving that compliance with this subpart would result in such alteration or burdens…" that they can forgo abiding it. There is no burden on defendants regarding where she receives mail. Under 28 CFR 35.130 General Prohibitions Against Discrimination, there are so many applicable statements to Plaintiffs situation, she cannot mention them all here. Per (a) No qualified individual with a disability shall on the basis of disability be excluded from participation or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."  The point of the disability protections established in the ADA of 1990, were doubly applied and recognized in the Americans with Disabilities Act Amendments in 2008.

89.     Plaintiff told Loretta Owens when they spoke on the phone Sept 9, 2021 that she is not diagnosed as needing a po box. When you've read Plaintiff's reasons in her communications to DHA and complaint in the suit in 2021–the best summary is probably the complaint in the prior suit– anyone should say it makes sense. To act like it takes a medical degree and elaborate explanations is nonsense.

90.     24 CFR 8.4(b)(1) "A recipient [of HUD money], in providing any housing, aid, benefit, or service in a program or activity that receives Federal financial assistance from the Department may not, directly or through contractual, licensing, or other arrangements, solely on the basis of handicap:...(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement afforded to others."  That means requiring Plaintiff to do what everyone else does is not equality.  The public entity must act to provide the disabled person the ability to achieve the same result as others.  In Plaintiff's case that is to send mail to her po box.  In 24 CFR 8.6(a)(1)(i) Communications,   "In determining what auxiliary aids are necessary, the recipient shall give primary consideration to the requests of the individual with handicaps."

91.     Per 12101(a)(5) Findings and Purpose.(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and

practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

92.    Pub. L. 110–325, §2, Sept. 25, 2008, 122 Stat. 3553 (in the Statutory Notes in 42 USC 12101), provided that:

"(b) Purposes.-The purposes of this Act [see Short Title of 2008 Amendment note above] are-

"(5) to convey congressional intent that the standard created by the Supreme Court in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) for 'substantially limits', and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."

49

93.     If you see the package of forms this 504 Coordinator's office is sending out, it appears that the PHA sees their role is to screen people out, not help disabled individuals. Plaintiff can probably list on at least 5 pages irregularities they have in their package that is illegally adding to federal law. Even *looking at* the package they send is overwhelming.

**42 U.S.C. §12203. Prohibition against retaliation and coercion in the ADA**

94.     "(a) Retaliation

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) Interference, coercion, or intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

94.     The whole shut down of communication since last fall is clearly in reaction to the Civil suit Plaintiff was forced to file in 2021. The Director of the Housing Voucher Program was offended that Plaintiff told her employees the law.  She has probably protected them from any repercussions from their wrong-doing.  She didn't seem to be the least bit bothered when Plaintiff told her about Ms. Trujillo's actions.

95.     Besides the communication shut down, Ms. Owens has seemingly endorsed that Plaintiff is required to pay an extra $21/mo since Dec in retaliation for prior suit and pursuit of equal rights. There is a chart of utility estimates for factoring estimates of utilities when a tenant is supposed to pay those directly to the utility company. For Plaintiff, all utilities except electric are paid to the landlord at $54/mo. per Plaintiff's lease. The only number that should be estimated is electric since it is the only unknown. The amount of that is about $35. If Plaintiff's rent and utilities exceed the payment standard, she is required to pay the difference. For 2022, the Payment Standard was $1,304. Plaintiff's rent is $1,200 & $54/mo. is required to be paid with the rent for landlord-provided utilities. So $2,054 goes monthly to the landlord . When Plaintiff does the math and adds the estimate for the electric of approx $35, that comes to $1,289 which is not higher than $1,304. The way they came up with $1,325 total and saying the rent + utilities is over $1,304 by $21 is by pretending plaintiff doesn't have a required amount to pay to the landlord for most utilities and estimated *all* of her utilities. Plaintiff tried several times without success to get it corrected.

### 42 USC §12133. Enforcement

96.     The remedies, procedures, and rights set forth in section 794a of title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title. 42 USC 12133.

**§794a. Remedies and attorney fees**

97.    (2) The remedies, procedures, and rights set forth in title VI of the Civil Rights Act

of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act

(42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be

available to any person aggrieved by any act or failure to act by any recipient of Federal

assistance or Federal provider of such assistance under section 794 of this title.

(b) In any action or proceeding to enforce or charge a violation of a provision of this

subchapter, the court, in its discretion, may allow the prevailing party, other than the

United States, a reasonable attorney's fee as part of the costs.

98.    **42 USC §2000d–7. Civil rights remedies equalization**

**(a) General provision**

(1) A State shall not be immune under the Eleventh Amendment of the Constitution of

the United States from suit in Federal court for a violation of section 504 of the

Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the Education Amendments of

1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et

seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions

of any other Federal statute prohibiting discrimination by recipients of Federal financial

assistance.

(2) In a suit against a State for a violation of a statute referred to in paragraph (1),

remedies (including remedies both at law and in equity) are available for such a

violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

99.   **§1988. Proceedings in vindication of civil rights**

**(a) Applicability of statutory and common law**

The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

**(b) Attorney's fees**

In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C. 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C. 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or section 12361

of title 34, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

**(c) Expert fees**

In awarding an attorney's fee under subsection (b) in any action or proceeding to enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee.

## IX.    DAMAGES & PRAYER FOR RELIEF

100.    Plaintiff needs to receive the documents necessary to renew her housing for FY2023 as soon as possible. Within 7 days of receiving those, Plaintiff will return them and address any other concerns needed at that time. If defendants have done anything negative to threaten the Plaintiff's voucher they need to immediately undo it.  It's ok to send email, though wait till Plaintiff opens a new email account. Her account was hacked. The password is changed but she is still not confident about the account. She will send info on her new account asap.  And please call or text if anything is sent in postal mail. Plaintiff much prefers texts if possible. Plaintiff will try to check her box for mail at least twice a week.

54

101.    The DHA as an agency due to its established policies has created egregious

circumstances for Plaintiff. Firstly the insistence that participants receive mail at their

residence no matter how inappropriate, difficult or harmful that is. This requirement is

put into a contract a participant must sign to get housing so it is indisputably an agency

act. Not to mention willingness to go to court over the matter.

102.    The package of papers being given to anyone requesting accommodations is

disconcerting. From thinking a doctor should fill out seven pages of information (no

doctor plaintiff has ever had would read 7 pages of anything.) and attest that the

plaintiff, (already determined to be disabled by Sec.Sec Administration to be disabled),

is to a legal certainty disabled. No doctor should be attesting anything to a legal

certainty unless they also have a law degree. To give Plaintiff forms explaining to her

what a disability is and what a major life activity is completely without sense. Plaintiff is

well aware what a disability is. She lives with it everyday. Working is a major life activity.

Social Security would not pay Plaintiff if she were able to work.  Having a 504 Coord is

not to stand in place of the doctors at the Social Security Administration. Plaintiff doesn't

expect someone not well-versed in such things to understand how variable mental

illnesses are and they are not likely to understand what mentally disabled participants

need as help.  It is a DHA policy to give everyone who wants accommodations this set

of papers. Prior to trial, Plaintiff will do a complete breakdown of those and indicate why

and how they don't make sense.

103.    There is clearly an agency policy of not communicating at all with Plaintiff, in spite

of many places in the law indicating their requirement to maintain communication and

do so in a manner that works for Plaintiff. In the first instance at the beginning of Oct

2021 she wasn't sent an intended rent payment increase–something Plaintiff needs to

know in order to pay more. Secondly a letter sent to Ms.Owens Nov 2, 2021 received no

response, and thirdly in a letter to the 504 Coordinator, Ms. Pinada, Plaintiff did not get

a response to a letter sent to her in January 2022. This is quite clearly an agency policy

if it is happening in numerous departments in the agency.  Those policies have resulted

in extreme harm to Plaintiff. Plaintiff was at least in a stable condition having taken the

same medication for years until the issues with the housing agency moved in on her life.

In June 2022 Plaintiff added another antidepressant. Plaintiff is looking for a place to get

counseling. The only other time she had counseling was to deal with a death threat in

1990.

**104.   Plaintiff requests damages from the agency in the amount of $1 million**

**dollars**

 for wreaking havoc in plaintiff's life over a period of months since last September of

2021. She gets nauseous over the actions and inactions of DHA. She gets headaches

regularly and got them very rarely in the past.  She has a constant feeling of significant

stress, like would be felt if you were looking at a height over a body of water and being

supposed to jump in.  It's like a constant fear. It surely doesn't look like it, but Plaintiff

has had to put probably a couple hundred hours reading law and trying to figure out how

to write a complaint without having it kicked back for a re-write while 2 weeks from living

in a tent as happened last September.

105.    Exacerbation of her disability has been firstly orchestrated by DHA as an agency. Plaintiff's disability and condition has been ignored by individuals in the program. We all know of situations where individuals in a group participate in bad or even in evil behavior because they are told to or because 'everyone' else is doing it. They know what is right but don't do what is right. Any of them involved at DHA know that Plaintiff losing her housing is the likely result of their actions, but they bury their heads and act innocent. It shouldn't fool anyone. For the acts of Ms. Matteo and Ms. Trujillo, there is no doubt they orchestrated a plan out of malice to harm Plaintiff. Whether it is seen as a conspiracy, which it should  be, but is at least in violation of 42 USC 1983 for them both. They acted with the deliberate goal of harming Plaintiff. But if someone is lulled by their innocent act, they participated in at least minimum reckless indifference to Plaintiff's welfare. **Ms. Matteo and Ms. Trujillo should each pay Plaintiff $500,000 in damages.**

106.    Plaintiff believes Ms. Owens and Ms. Pineda have been functioning in reckless disregard of the consequences of their actions in refusing to aid Plaintiff this year–even if that's what they think they are supposed to do per agency policy, and have set up the same circumstances as last year.  We are all aware of how docile people have been in activities they are told to do by an 'authority figure' or to follow the rules. But individuals cannot throw away their own integrity to doing what's morally right. But whether it's a scheme in a conspiracy or two players working in reckless disregard of the consequences of their actions, or two individuals who think they have to follow the agency guidelines, when they see they are harming a disabled person who should be

getting their protection, the result is the same for Plaintiff. She loses her voucher and becomes homeless. Plaintiff can't count the number of times her neck and back ache from sitting at the table typing. Plaintiff shouldn't be carrying around a feeling inside like she needs to flee from something. **Plaintiff requests damages from Ms. Owens and from Ms. Pineda in the amount of $500,000 ea.**

**107.** **Specific performance** on the part of Executive Director David Nisivoccia, who has exhibited **negligence** in averting his attention from the negative acts happening under his nose.

**A.** Executive Director Nisivoccia needs to ensure all steps are taken to facilitate Plaintiff's housing voucher is recognized so she is situated to sign a lease with the landlord by mid-August and proceed living in housing come October 1, 2022.

**B.** Plaintiff requests a permanent injunction to keep DHA from dictating where anyone gets their mail and Mr. Nisivoccia,needs to

**C.** orchestrate having that requirement removed from any contractual agreements applicants or participants are required to sign and

**D**. a mailing should go out to all program participants that using a po box is permitted. Plaintiff shouldn't be having an annual battle that is resulting in year-round stress and pain and aggravation. There can come a time that Plaintiff has no fight left in her to stand for what's right. And her ability to have shelter should not be on the line on an annual basis.

**E.** Mr. Nisivoccia needs to have developed a test for disability laws for anyone dealing with applicants or participants which is required to be passed with a perfect score. They can re-take the test as often as it takes for them to know disability laws, before they make any decisions or interact with any applicants or participants. Using disability statutes and regulations and key cases, form something like a 100 question multiple choice required test. "Training" never seems to work for this subject.

**F.** Exec Dir.Nisivoccia needs to adopt a firm policy that under *no* circumstance do any employees terminate communications with applicants or participants and to do so will risk serious repercussions to include possibly job loss .

**G.** Exec Dir Nisivoccia needs to develop a policy for clearly putting employees' jobs on the line for the deliberate actions seen in the conspiracy to terminate Plaintiff's housing voucher in 2021 by Ms. Matteo and Ms.Trujillo.

**H.** It may be legal, but Plaintiff doesn't see why the Denver Housing Authority "automatically collects…6. The Uniform Resource Locator of the site which a user visited prior to denverhousing.org." One expects dubius actions in a capitalistic society but doesn't expect it from a non-profit housing assistance program. Plaintiff requests defendants stop trying to find out what someone is doing prior to visiting your website. The executive director can also address this.

**108.**     Correction should be made to the rent amounts between Plaintiff and DHA for 2022. Plaintiff's rent is $1,200/mo. and additionally $54/mo in utility costs paid to the

landlord for utilities they pay. The only amount plaintiff pays directly to the utility company directly is her electric, which I think is estimated at $35/mo. on Defendant's utility chart. Plaintiff believes the payment standard for 2022 was $1,304. $1,200+$54+$35= $1,289 which appears to be lower than $1,304, so Plaintiff would like an explanation of why your office is pretending Plaintiff pays all utilities separately herself such that you used estimated utilities for all of them coming up with $21/mo. over the payment standard and have been charging the extra $21 to the Plaintiff since December 2021. Plaintiff has pointed this out to the housing staff last fall who don't want to look at the issue. Plaintiff requests to be refunded for any amounts she was overcharged because of this.

109.   Mr Nisivoccia should address the attitude of the organization toward landlords. Plaintiff needs DHA to act like they want to work with a company who has probably a couple hundred rental properties, and to aspire to be on good terms. Plaintiff has read that 40% of voucher recipients lose them because they can't find a place to live within the money limits.  If a landlord is willing to work with a government program, and 97% of them were not when Plaintiff was trying to move from Michigan, then the Voucher Program needs to show landlords respect, including the respect of doing accurate rent reasonable evaluations (to include time of rental, consideration of the rental market, and realistic identification of similar units.). If the agency acts arrogant like they can tell landlords what they can do without even having the facts behind their attitude, 97% of landlords declining to work with government programs will go to zero.  Plaintiff requests that DHA be required to treat her landlord with respect and provide a quality work

product and negotiate to find an amount of rent that is fair to both. If DHA thinks they should insist a landlord take a significant amount lower than a market rate rent, they are hurting voucher holders in finding an acceptable place to live.  Part of being fair is to make rent reasonable evaluations much closer to the rental time. In FY2022 it took very little time for Plaintiff to contact her landlord to find out what units virtually identical to hers had rented for. Plaintiff's situation is so simple it shouldn't take more than an hour to add medical receipts and apply a few formulas. There's no reason to do that 3 months prior to the rental period.

110.    And all defendants have committed violations of the Americans with Disabilities Act, the Fourteenth Amendment including substantive due process, procedural due process and equal protections that Plaintiff has been deprived of, the First Amendment for free speech and privacy, the Fourth Amendment for property rights, and the 9th Amendment for the People's rights—No one least of all the government should be dictating where anyone gets mail. All of these apply to all the defendants except free speech is only against  Ms. Trujillo and Ms. Matteo.

111.    The PHA is required by HUD to sign a Civil Rights Certification (**attach 9)**, which calls out the primacy of all the civil rights protections beyond what is contained in the contract the organization signs for funding. Whether or not it lays out specific damages on that page, it provides the citations and since it's brought to their attention these are of particular importance, they are put on notice to check the damages if they have any doubts.

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge . Executed on August 8, 2022.  Plaintiff will deliver this complaint to the office of the defendants the next business day after filing along with forms for waiver of service of summons.

Respectfully yours,

Caroll Latimore, Pro se

1541 N. Marion St. box 18628

Denver, Colorado 80218

239.537.5966